## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) DAVID LIEBENSOHN,<br><br>Plaintiff,<br><br>v.<br><br>(1) KIM KARDASHIAN WEST,<br>(2) KIMSAPRINCESS, INC., a California Corporation;<br><br><br>Defendants. | Case No.: CIV-19-137-C<br><br>**COMPLAINT FOR:**<br><br>1.  **BREACH OF PARTNERSHIP AGREEMENT;**<br>2.  **BREACH OF FIDUCIARY DUTY;**<br>3.  **UNJUST ENRICHMENT;**<br>4.  **FRAUD**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Liebensohn ("Liebensohn"), by and through his attorneys, and for his Complaint herein, alleges as follows:

### PARTIES

1.    Plaintiff Liebensohn is an individual who is a citizen of the State of Oklahoma.

2.    Defendant Kim Kardashian West ("Kardashian West") is a natural person who, on information and belief, is and was at all times relevant to the action, a resident of the County of Los Angeles, California and a citizen of the State of California. Kardashian West is a celebrity and reality television star.

3.    Defendant Kimsaprincess, Inc. is a corporation organized under the laws of the State of California having a principal place of business at 21731 Ventura Boulevard,

Suite 300, Woodland Hills, CA 91364. Defendant Kimsaprincess Inc. is wholly owned, controlled, and dominated by Kardashian West for the benefit of Kardashian West. At all times described herein there is and was a unity of interest and ownership between Kardashian West and Kimsaprincess, Inc. At all times described herein, Kardashian West and her namesake company were alter egos of each other and Kimsaprincess Inc. acted as Kardashian West's agent.

## JURISDICTION AND VENUE

4.     Liebensohn brings his complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

5.     Venue in the United States District Court, Western District of Oklahoma is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions on which the claims are based occurred in the Western District of Oklahoma.

## GENERAL ALLEGATIONS

6.     In 2014, Liebensohn, along with two other individuals named Narayan Shankar and Daniel Rice, founded App Social LLC. The general purpose of App Social LLC was to create applications for social media users.

7.     From January to June 2014, Liebenson, along with Mr. Shankar and Mr. Rice, grew the App Social LLC by creating applications that would enhance a user's social media experience. They developed an application called CensorGram (later changed to CensorOut) to protect social media users' accounts from bullying, spammers, and trolls on Instagram. It allowed the account holder to filter and automatically delete

unwanted comments and hashtags and ban unwanted users. The account holder could easily filter any single username, hashtag, or word or phrase to be removed from their profile on any post and provided push notifications or emails to alert the account holder that comments were removed.

8.      Separately, in early 2014, App Social LLC also began to develop "Wall Street" emojis as well as provocative "sexy" emoji content.

9.      CensorGram caught Kardashian West's attention. On June 18, 2014, Kardashian West's friend and social media assistant, Jonathan Cheban, contacted App Social LLC via Instagram Messenger stating that Kardashian West was interested in the application and wanted to discuss her potential investment. Mr. Cheban proposed an 80%/20% divide in profits. Liebensohn and the other two members were not interested in such a wildly inequitable split. However, they were again contacted and informed of Kardashian West's interest in partnering with them. The parties scheduled a telephonic conference for July 15, 2014.

10.      On July 15, 2014, Kardashian West called Liebensohn and Mr. Rice in Oklahoma. They discussed their vision for the application, how Kardashian West could help them get to the next level of exposure, how Kardashian West had been using the application, and her love of the application. During this meeting, Kardashian West admitted that she had discussed anti-bullying features to be implemented in Instagram with Instagram's CEO, but that Instagram was unwilling to implement a one-size-fits-all solution to bullying and preferred to handle comments on a case-by-case basis, which was not to Kardashian West's liking.

11.     Following many emails back and forth, the parties agreed upon July 28, 2014 as the date they would meet in person in Calabasas, California.

12.     When Liebensohn, Mr. Shankar, and Mr. Rice realized they would be working with Kardashian West, they took the already developed "Wall Street" and "sexy" emojis and added Kardashian West's likeness. They shared the idea of "Kimojis," a set of animated emojis and GIFs of the Kardashian family, with Kardashian West. Kardashian West loved this idea and insisted that she file the KIMOJI trademark application to save costs. Kardashian West promised that they would promote the concept together as a team.

13.     On July 28, 2014, the parties met at the home of Kris Jenner (Kardashian West's mother) in Calabasas, California. At this meeting, the parties finalized the terms of the partnership. They agreed that the partnership division would be 60% to Liebensohn, Mr. Shankar, and Mr. Rice, and 40% to Kardashian West. App Social would contribute its skill, intellectual property, and ideas relating to CensorGram and the emoji content, and Kardashian West would raise $660,000 for capital contributions.

14.     Based on the understanding that the parties entered a partnership, Liebensohn, along with Mr. Shankar and Mr. Rice, shared their prototype for the Kimoji concept to Kardashian West. Kardashian West was enthusiastic about the ideas, especially the concept of provocative emojis. She said it was a great project that she wanted to pursue.

15.     On August 14, 2014, Kardashian West called Mr. Shankar and asked if Liebensohn, Mr. Shankar, or Mr. Rice had filed the KIMOJI trademark application. Mr.

Shankar informed her that they had not, and Kardashian West insisted that her team would file the application. Again, she insisted that there was no need for them to bear the cost. In reliance on Kardashian West's confirmation of the partnership, it was agreed that Kardashian West would take care of the KIMOJI trademark application.

16.     On August 14, 2014, Kardashian West filed the first trademark application for KIMOJI, identifying the sole owner as her corporation, Kimsaprincess, Inc.

17.     Subsequently on August 14, 2014, after filing the KIMOJI trademark application, Kardashian West called Mr. Shankar again. This time, she demanded to know who "Ryan" was -- despite calling Mr. Shankar "Ryan" unprompted in her July 22, 2014 email correspondence. Kardashian West claimed that she just became aware of a screen shot originating from "Ryan" that contained personal information about Kardashian West's use of CensorOut, and accused Mr. Shankar of disseminating a screenshot to "all of Chicago."

18.     This accusation was confusing to Liebensohn, Mr. Shankar, and Mr. Rice. Their frustration grew as they members did not understand what happened or why.

19.     Kardashian West's attorney Todd Wilson later explained that Kardashian West received a screen shot from Mr. Shankar's acquaintance, allegedly originating from Mr. Shankar. Kardashian West used this as an excuse to cancel the partnership.

20.     The following day, on August 15, 2014, Kardashian West, through her attorney Martin Singer, Esq., sent Liebensohn, Mr. Shankar, and Mr. Rice a letter stating that they caused Kardashian emotional distress and defamation in excess of $5 million. Kardashian West also sent a Settlement Agreement and Mutual Release ("Release")

whereby Kardashian West would release Liebensohn, Mr. Shankar, and Mr. Rice from the $5 million potential lawsuit if they walked away from any future development of the Kimojis.

21.    Mr. Liebensohn refused to sign the Release.

22.    Kardashian filed KIMOJI trademarks for "Cases for mobile phones" (Serial No. 87281810); "Bathing suits; body suits; bottoms; flip flops; footwear; headwear; shorts; sweatshirts; t-shirts; tops; undergarments" (Serial No. 87281829); and "Retail store services featuring gifts, apparel, apparel accessories, cases for mobile phones, makeup bags, stickers, wrapping paper, ornamental novelty pins, jewelry and lighters" (Serial No. 87281841) on December 27, 2016. She filed a Kimoji mark for "Fragrances" (Serial No. 87380292) on March 21, 2017—and is currently being sued in federal court for trademark infringement on her Kimoji perfume line for her "Vibes" perfume, Case No. 1:18-cv-04910.

23.    About one year later, Liebensohn learned that Kardashian West released the Kimojis application and saw Kardashian West promoting and marketing the Kimojis. The Kimojis, originated by Liebensohn and App Social, were very profitable as all parties had anticipated.  Kardashian West continues to use and profit off the name "Kimoji" on products that are not smartphone applications, expanding to phone cases and perfume, for example—while it was Liebensohn, Mr. Rice, and Mr. Shankar who came up with this name.

24.    Liebensohn invested every penny and all of his time and effort to get the applications into the right hands.  He walked away with nothing except financial and

personal losses, while Kardashian West profited from his work without just compensation.

25.    In 2018, Liebensohn learned that Kardashian West was aware of the screen shot that allegedly originated from Mr. Shankar since *before* entering into the partnership agreement.  On information and belief, Kardashian West never intended to follow through on the partnership agreement.  Rather, she had the screen shot "in her pocket" and used it as a reason to cancel the partnership agreement after filing the KIMOJI trademark application in the name of her corporation Kimsaprincess, Inc.

## FIRST CAUSE OF ACTION

## BREACH OF PARTNERSHIP AGREEMENT

26.    Liebensohn realleges and incorporates herein by this reference paragraphs 1 through 25 of this Complaint as in fully set forth here.

27.    Liebensohn, individually and as a third party beneficiary of App Social LLC, and Defendants agreed to combine intellectual property, skill, knowledge, and financing with the intent to carry out a business undertaking, namely the development of CensorGram and the Kimojis.

28.    Liebenson, Mr. Rice, and Mr. Shankar had a 60% interest in the joint venture, Kardashian West had a 40% interest.  The parties agreed to share the profits accordingly.  This constituted a valid and enforceable partnership agreement.  The verbal agreement was further implied by the parties' conduct.

29.    Liebensohn and App Social LLC performed all of the actions required under the partnership agreement.

30.     Defendants failed to perform their obligations under the agreement by, without limitation, registering the KIMOJI marks under defendant Kimsaprincess, Inc., and refusing to share profits pursuant to the agreement.

31.     Defendants' failure to perform their obligations was unjustified and unexcused.

32.     As a result of the above-described acts, Liebensohn sustained damages in an amount according to proof at trial, but believed to be not less than $100,000,000.

## SECOND CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

33.     Liebensohn realleges and incorporates herein by this reference paragraphs 1 through 32 of this Complaint as in fully set forth here.

34.     Liebensohn, individually and as a third party beneficiary of App Social LLC, and Defendants agreed to combine intellectual property, skill, knowledge, and financing with the intent to carry out a business undertaking, namely the development of CensorGram and the Kimoji application.

35.     Liebensohn, Mr. Shankar, and Mr. Rice had a 60% interest in the joint venture, and Defendants had a 40% interest.  The parties agreed to share the profits accordingly.  This constituted a valid and enforceable partnership agreement.  This oral agreement was further implied by the parties' conduct.

36.     Liebensohn relied on the protections that the partnership relationship with Defendants should have provided.  Specifically, he created and developed valuable information, technology, concepts, and marks, including as related to

CensorGram/CensorOut, Kimoji, and sexy emojis, for the benefit of their partnership with Defendants, and shared their information openly and freely, reasonably expecting that all disclosures would be used for the benefit of the partnership.

37.    Defendants sought to, and did, exploit the partnership's information, technology, concepts, and marks solely for themselves and unlawfully exclude Liebensohn. Defendants knowingly acted against Liebensohn's interests in connection with the partnership. Defendants refused to share Liebensohn's profits pursuant to the partnership agreement. Further, Defendants identified Kimsaprincess, Inc. as the sole owner of the KIMOJI mark. This representation to the United States Patent and Trademark Office was patently false and fraudulent.

38.    Liebensohn did not consent to Defendants' conduct.

39.    As a result of the above-described acts, Liebensohn sustained damages in an amount according to proof at trial, but believed to be not less than $100,000,000.

## THIRD CAUSE OF ACTION

## UNJUST ENRICHMENT

40.    Liebensohn realleges and incorporates herein by this reference paragraphs 1 through 39 of this Complaint as in fully set forth here.

41.    This claim is for unjust enrichment by Defendants at Liebensohn's expense, both individually and as a third party beneficiary of App Social LLC, based upon Defendants' breach of the partnership agreement.

42.    Liebensohn conferred a benefit upon Defendants, namely providing the partnership with valuable information, technology, concepts, and marks. The motive for

Defendants' breach was to unjustly enrich themselves at Liebensohn's expense by not paying Liebensohn the amounts to which he is entitled.

43.     As of the time of Defendants' breach, Liebensohn had performed all of his obligations under the Agreement.

44.     As a direct and proximate result of Defendants' breach of the partnership agreement, Defendants have been unjustly enriched at Liebensohn's expense in an amount to be determined at trial but believed to be not less than $100,000,000. Liebensohn is entitled to restitution for the full amount of the payments that Defendants failed to make, to which they were not entitled.

## FOURTH CAUSE OF ACTION

## FRAUD

45.     Liebensohn realleges and incorporates herein by this reference paragraphs 1 through 44 of this Complaint as in fully set forth here.

46.     Defendants made a promise to Liebensohn to divide partnership profits 60% to Liebensohn, Mr. Shankar, and Mr. Rice,  and 40% to Defendants.  Kardashian West further promised to raise $660,000 for capital contributions.

47.     The promise made by Defendants were in fact false.  The true facts were that Defendants never intended to share any profits with Liebensohn or Mr. Shankar or Mr. Rice.  At the time Defendants made these promises to Liebensohn, Defendants knew them to be false and had no intention of performing according to those promises.  On information and belief, at the time Kardashian West made this promise, she was aware of a screen shot allegedly originating from Mr. Shankar.  She did not disclose this

awareness, but rather waited until she was ready use it as a basis to terminate the partnership.

48.     This promise was made by Defendants with the intent to induce Liebensohn to act in reliance on those representations in the manner here alleged.  Specifically, Defendants intended that Liebensohn rely on this promise to divide partnership profits 60% to App Social LLC and 40% to Kardashian West.  Liebensohn reasonably relied on Defendants' promise.  Liebensohn then shared his prototype for a "sexy emojis" application on Mr. Shankar's phone, and further detailed the Kimoji concept to Ms. Kardashian West.  If Liebensohn had known of Defendants' actual intention, Liebensohn would have never provided the CensorGram intellectual property or the Kimoji name, idea, or protoypes to Defendants.

49.     At the time Defendants' promises were made, and at the time Liebensohn shared information pertaining to the Kimoji name, idea, and prototypes, was ignorant of the falsity of Defendants' promises and Defendants secret intention to keep the profits for themselves.

50.     Defendants took full advantage of Liebensohn's trust and reliance on Defendants and their business expertise.

51.     As a result of the above-described acts, Liebensohn as suffered monetary damages in an amount according to proof at trial.  Liebebsohn's reliance on Defendants' promise was a substantial factor in causing his harm.

52.     Defendants committed the acts alleged herein in conscious disregard of Liebensohn's rights so as to justify an award of exemplary and punitive damages in amounts according to proof at time of trial

WHEREFORE, Plaintiff prays judgment as follows:

A.      On the first claim, for actual and consequential damages in an amount to be determined at trial, but not less than $100,000,000 against all defendants jointly and severally;

B.      On the second claim, in an amount to be determined at trial, but not less than $100,000,000 against all defendants jointly and severally;

C.      On the third claim, for restitution against Defendants including, but not limited to, restitution based on Defendants' unjust enrichment and/or ill-gotten gains received at Liebensohn's expense in an amount to be determined at trial, but not less than $100,000,000 against all defendants jointly and severally;

D.      Punitive damages;

E.      Pre-judgment and post-judgment interest at the legal rate;

F.      All expenses and costs of suit incurred herein, including by not limited to expert witness fees; and

G.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Liebensohn hereby respectfully demands a trial by jury of this action.

Dated: February 12, 2019

_____/s/  Andrew J. Waldron_____
ANDREW J. WALDRON, OBA 17362
Walker & Walker
511 Couch Drive, Third Floor
Oklahoma City, Oklahoma 73102
Telephone: (405) 943-9693
Facsimile: (405) 232-1108


_____/s/___Robert J. Hantman_____
ROBERT J. HANTMAN (RH-3947) (*Trial and Co-
Counsel, Subject to Pro Hac Vice Admission*)
Hantman & Associates
1414 Avenue of the Americas, Suite 406
New York, NY 10019
Telephone: (212) 684-3933
Facsimile: (212) 755-1989

Attorneys for Plaintiff DAVID LIEBENSOHN


ATTORNEY'S LIEN CLAIMED
JURY TRIAL DEMANDED